[No. 84632-4. En Banc.]
Argued June 16, 2011. Decided December 22, 2011.

FIVE CORNERS FAMILY FARMERS ET AL., *Appellants*, v. THE STATE OF WASHINGTON ET AL., *Respondents*.

298

*Janette K. Brimmer* and *Kristen L. Boyles* (of *Earthjustice*), for appellants.

*Robert M. McKenna, Attorney General,* and *Mary Sue Wilson, Assistant,* for respondents State and Department of Ecology.

*William L. Cameron* (of *Lee Smart PS*) and *R. Crane Bergdahl,* for respondent Easterday Ranches Inc.

*Gregory S. McElroy* (of *McElroy Law Firm PLLC*); *James L. Buchal* (of *Murphy & Buchal LLP*); and *Jeffrey D. Slothower,* for respondents Washington Cattlemen's Association et al.

*Diana R. Bob* on behalf of Lummi Nation, amicus curiae.

*Brian C. Gruber* on behalf of Colville Confederated Tribes, amicus curiae.

*Lauren P. Rasmussen* on behalf of Jamestown S'Klallam Tribe and Port Gamble S'Klallam Tribe, amici curiae.

*Bill Tobin,* on behalf of Nisqually Tribe, amicus curiae.

*Samuel J. Stiltner* and *Lisa A. Brautigam* on behalf of Puyallup Tribe of Indians, amicus curiae.

*Karen Allston* on behalf of Quinault Indian Nation, amicus curiae.

*Melody L. Allen* on behalf of Suquamish Tribe, amicus curiae.

*Emily Rae Hutchinson* on behalf of Swinomish Indian Tribal Community, amicus curiae.

*Jeffrey S. Schuster* on behalf of Yakama Nation, amicus curiae.

*David L. Monthie* on behalf of Aqua Permanente, amicus curiae.

---

¶1 Owens, J. — By statute, the legislature requires a permit to withdraw public groundwater or to construct a well to do so. RCW 90.44.050. The statute also provides exemptions from the permit requirement for certain uses. This case concerns the scope of one of those exemptions. We conclude that, under the plain language of the statute, withdrawals of groundwater for stock-watering purposes are not limited to any particular quantity by RCW 90.44-.050. Accordingly, we affirm the superior court's grant of summary judgment to the respondents. We also affirm the superior court's refusal to grant summary judgment against the appellants on the basis of standing and its determination that Easterday Ranches Inc. is not entitled to attorney fees as a result of the change of venue.

## FACTS

¶2 Easterday seeks to operate a large cattle feedlot in Franklin County. In order to provide water for the 30,000 head of cattle operation, Easterday drilled a well into the Grande Ronde aquifer. At the suggestion of the Department of Ecology (Department), Easterday acquired water rights from a neighboring farm. This transfer, referred to as the "Pepiot Transfer," gave Easterday the right to withdraw 316

acre feet[1] of water per year, which is approximately 282,106 gallons per day. This water is used both for stock drinking water and other feedlot purposes; under the transfer up to 66 acre feet per year, or approximately 58,921 gallons per day, may be used of stock drinking water. The estimated stock drinking water required is between 450,000 and 600,000 gallons per day. Easterday contends, and the Department agreed, that Easterday's withdrawal of the additional groundwater for stock-watering purposes is exempt from statutory permit requirements. *See* RCW 90.44.050.

¶3 Scott Collin, Five Corners Family Farmers, the Center for Environmental Law and Policy (CELP), and the Sierra Club (collectively Appellants) filed a declaratory judgment action against the State of Washington, the Department, and Easterday in Thurston County Superior Court. Appellants sought a declaration that the stock-watering exemption from the permit requirement in RCW 90.44.050 is limited to uses of less than 5,000 gallons per day. Appellants further sought an injunction ordering Easterday to cease groundwater use without a permit. Thurston County Superior Court granted Easterday's motion to change venue to Franklin County but denied Easterday's request for attorney fees pursuant to RCW 4.12.090.

¶4 Franklin County Superior Court allowed multiple agricultural organizations to intervene as defendants. The parties filed cross motions for summary judgment. The court concluded that genuine issues of material fact precluded Easterday's motion for summary judgment on the basis of standing but granted the summary judgment motions of Easterday, the Department, and the intervenors (collectively Respondents) with respect to the interpretation of RCW 90.44.050, which the court held unambiguously provides an exemption from the permit requirement for withdrawal of any amount of groundwater for stock-water-

---

[1] One acre foot is approximately 325,851 gallons.

ing purposes. Appellants filed a notice of appeal, seeking direct review by this court. Easterday filed a notice of cross appeal, seeking review of Thurston County Superior Court's refusal to grant Easterday attorney fees for the change of venue and Franklin County Superior Court's failure to dismiss for lack of standing. We retained the case for decision.

## ISSUES

¶5 1. Do Appellants possess standing to bring this declaratory judgment action?

¶6 2. Is the stock-watering exemption in RCW 90.44.050 limited to 5,000 gallons per day?

¶7 3. Is Easterday entitled to attorney fees under RCW 4.12.090?

## ANALYSIS

I. Standing

■ ¶8 Appellants have standing to bring this declaratory judgment action. Standing for purposes of the Uniform Declaratory Judgments Act, chapter 7.24 RCW, is set forth in RCW 7.24.020, which provides, in relevant part, that

[a] person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder.

In order to establish that a party's "rights, status or other legal relations are affected by a statute," *id.*, we employ a two-part standing test:[2] (1) the interest asserted must be

---

[2] We also require that there be a "justiciable controversy," a concept that tends to overlap standing requirements. *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 410-11 & n.5, 27 P.3d 1149 (2001); *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 203, 11 P.3d 762, 27 P.3d 608 (2000). Easterday alleges only that

" 'arguably within the zone of interests to be protected or regulated by the statute . . . in question' " and (2) the challenged action must have "caused 'injury in fact,' economic or otherwise, to the party seeking standing." *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802, 83 P.3d 419 (2004) (internal quotation marks omitted) (quoting *Save a Valuable Env't v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978)).

¶9 Where the injury complained of is procedural in nature, standing requirements are relaxed. *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 794-95, 920 P.2d 581 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). In order to show a procedural injury, a party must (1) identify a constitutional or statutory procedural right that the government has allegedly violated, (2) demonstrate a reasonable probability that the deprivation of the procedural right will threaten a concrete interest of the party's, and (3) show that the party's interest is one protected by the statute or constitution. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009); *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001); *Seattle Bldg. & Constr. Trades Council*, 129 Wn.2d at 795. The third element is a specific application of the "zone of interests" component of the standing inquiry.

¶10 Appellants have standing. First, Appellants have identified a procedural injury sufficient to establish an injury in fact. The procedural right Appellants were allegedly denied was to have the Department review a permit application and consider, among other things, whether the withdrawal of groundwater would "impair existing rights or be detrimental to the public welfare." RCW 90.03.290(3). Appellants have also demonstrated a concrete interest that would be affected by the deprivation of that procedural right.

---

Appellants lack standing. We therefore do not consider the remaining justiciability requirements.

Collin, a member of Five Corners Family Farmers and CELP, has applied for a permit to drill a new well. Because Easterday's water right established by beneficial use of its permit-exempt withdrawals would have a senior interest, Easterday would have priority to use the water over Collin and, if there is insufficient water, Easterday's well would preclude Collin from obtaining a permit. Collin also employs an existing well that draws from either the Wanapum or Grande Ronde aquifer. Collin has a concrete interest in protecting his existing use of water and obtaining a permit to drill a new well. Cumulatively, this is sufficient to establish a genuine issue of material fact as to whether there is a reasonable probability that Collin would be affected by the Department's failure to require a permit for Easterday's stock-watering withdrawals.

¶11 Organizations have standing to assert the interests of their members, so long as members of the organization would otherwise have standing to sue, the purpose of the organization is germane to the issue, and neither the claim nor the relief requires the participation of individual members. *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 213-14, 45 P.3d 186, 50 P.3d 618 (2002). Collin's standing and his membership support standing for Five Corners Family Farmers and CELP. Sierra Club has established a genuine issue of material fact as to whether there is a reasonable probability that withdrawals of groundwater will impact its members' specifically alleged concrete interest in recreational use of surface waters. These issues are all germane to purposes of the organizations seeking standing, and the claims and relief sought do not require participation by individual members.

¶12 Finally, we have little difficulty concluding that Appellants' interests are within the zone of interests to be protected by the statute. In ascertaining the zone of interests protected by a statute, it is appropriate to look both to the operation of the statute, *Branson v. Port of Seattle*, 152 Wn.2d 862, 876, 101 P.3d 67 (2004), and to the statute's

general purpose, *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 414-15, 27 P.3d 1149 (2001). When determining whether to issue a permit for the use of water, the Department considers, among other things, whether the proposed use will "impair existing rights or be detrimental to the public welfare." RCW 90.03.290(3); *see* RCW 90.44.060 (subjecting withdrawals of groundwater to the requirements of RCW 90.03.250-.340). It is thus clear that the interests protected by the statute include those that Appellants assert here.

¶13 Accordingly, Appellants all possess standing to challenge the Department's interpretation of RCW 90.44.050 that allows Easterday to withdraw over 5,000 gallons of water per day without obtaining a permit. The trial court did not err in declining to grant summary judgment on the basis of an absence of standing.

II. RCW 90.44.050 Allows Permit-Exempt Withdrawals of Groundwater of Any Amount for Stock-Watering Purposes

¶14 We now turn to the heart of this declaratory judgment action: the interpretation of RCW 90.44.050. We are guided in this process by familiar rules of statutory construction. Our fundamental objective when interpreting a statute is "to discern and implement the intent of the legislature." *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). The surest indication of the legislature's intent is the plain meaning of the statute, which we glean "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). If the statute is "susceptible to two or more reasonable interpretations," it is ambiguous. *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005). The fact that two or more interpretations are conceivable does not render a statute ambiguous. *Id.* If

a statute is ambiguous, we "may look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent." *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003).

¶15 The full text of RCW 90.44.050 is as follows:

After June 6, 1945, no withdrawal of public groundwaters of the state shall be begun, nor shall any well or other works for such withdrawal be constructed, unless an application to appropriate such waters has been made to the department and a permit has been granted by it as herein provided: EXCEPT, HOWEVER, That any withdrawal of public groundwaters for stock-watering purposes, or for the watering of a lawn or of a noncommercial garden not exceeding one-half acre in area, or for single or group domestic uses in an amount not exceeding five thousand gallons a day, or as provided in RCW 90.44.052, or for an industrial purpose in an amount not exceeding five thousand gallons a day, is and shall be exempt from the provisions of this section, but, to the extent that it is regularly used beneficially, shall be entitled to a right equal to that established by a permit issued under the provisions of this chapter: PROVIDED, HOWEVER, That the department from time to time may require the person or agency making any such small withdrawal to furnish information as to the means for and the quantity of that withdrawal: PROVIDED, FURTHER, That at the option of the party making withdrawals of groundwaters of the state not exceeding five thousand gallons per day, applications under this section or declarations under RCW 90.44.090 may be filed and permits and certificates obtained in the same manner and under the same requirements as is in this chapter provided in the case of withdrawals in excess of five thousand gallons a day.

In effect, the statute prohibits withdrawal of public groundwaters until the Department grants a permit to do so and then sets forth a number of exceptions to this general rule. We refer to the sentence defining the exceptions as the "exemption clause." The statute also includes two provisos relating to the exemption clause, the first

allowing the Department to require information from persons or entities making permit-exempt withdrawals of groundwater and the second allowing those persons or entities withdrawing 5,000 or fewer gallons of groundwater per day under a permit exemption to apply for a permit.

¶16 The parties propose two competing constructions of the exemption clause. Respondents contend that the exemption clause should be divided into four distinct categories as follows:

[A]ny withdrawal of public groundwaters

[(1)] for stock-watering purposes, or

[(2)] for the watering of a lawn or of a noncommercial garden not exceeding one-half acre in area, or

[(3)] for single or group domestic uses in an amount not exceeding five thousand gallons a day, or as provided in RCW 90.44.052, or

[(4)] for an industrial purpose in an amount not exceeding five thousand gallons a day,

is and shall be exempt from the provisions of this section.

RCW 90.44.050. Appellants, on the other hand, contend that the exemption clause breaks down into two categories:

[A]ny withdrawal of public groundwaters

[(1)] for stock-watering purposes, or for the watering of a lawn or of a noncommercial garden not exceeding one-half acre in area, or for single or group domestic uses in an amount not exceeding five thousand gallons a day, or as provided in RCW 90.44.052, or

[(2)] for an industrial purpose in an amount not exceeding five thousand gallons a day,

is and shall be exempt from the provisions of this section.

*Id.* On the basis of this construction, Appellants argue that the "five thousand gallons a day," *id.*, limitation applies to all three uses included in the first category. In other words, Appellants contend that there are two categories and that the first category is a "bundle" of uses, each use being

subject to the 5,000 gallon per day limitation. We will address each proposed interpretation in turn.

¶17 Respondents' interpretation of the exemption clause is reasonable. The interpretation dividing the clause into four distinct exemptions accounts for each word used by the legislature. The categories are logically divided by the legislature's consistent use of the term "or for," which appears three times in the proviso, naturally suggesting four categories. In this way, Respondents' interpretation recognizes the parallel structure of the statute.

¶18 Respondents further rely on a 2005 formal attorney general opinion interpreting RCW 90.44.050, 2005 Op. Att'y Gen. No. 17. Such opinions are generally "entitled to great weight." *Seattle Bldg. & Constr. Trades Council*, 129 Wn.2d at 803. A formal attorney general opinion may be persuasive authority for one or more of at least three reasons. First, such opinions represent the considered legal opinion of the constitutionally designated "legal adviser of the state officers." WASH. CONST. art. III, § 21; *cf. City of Seattle v. McKenna*, 172 Wn.2d 551, 556-57, 259 P.3d 1087 (2011) (discussing generally the role of the attorney general under the Washington Constitution). Second, we presume that the legislature is aware of formal opinions issued by the attorney general and a failure to amend the statute in response to the formal opinion may, in appropriate circumstances, be treated as a form of legislative acquiescence in that interpretation. *Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 63-64, 847 P.2d 440 (1993). The weight of this factor increases over time and decreases where the opinion is inconsistent with previous formal opinions, administrative interpretations, or court opinions. *See Davis v. County of King*, 77 Wn.2d 930, 933, 468 P.2d 679 (1970) (addressing inconsistent formal attorney general opinions). Third, where the opinion is issued in close temporal proximity to the passage of the statute in question, it may shed light on the intent of the legislature, keeping in mind, of course, that the attorney general is a member of a separate branch of government.

*See Kaiser Aluminum & Chem. Corp. v. Dep't of Labor & Indus.*, 121 Wn.2d 776, 785, 854 P.2d 611 (1993).

¶19 In the present case, the formal attorney general opinion that Respondents urge us to rely on was issued 60 years after enactment of the statute in question and is contrary to early administrative interpretations of that statute. *See* 2005 Op. Att'y Gen. No. 17. Moreover, the legislature cannot be said to have acquiesced in the attorney general's interpretation because it subsequently established a working group to review the issue. ENGROSSED SUBSTITUTE H.B. 1244, § 302(17), 61st Leg., Reg. Sess. (Wash. 2009). As such, the attorney general opinion's force lies exclusively in the persuasiveness of the reasoning. We find much of the reasoning in the attorney general's 2005 opinion persuasive and have incorporated it in our analysis.

¶20 Notwithstanding the obvious reasonableness of Respondents' division of the exemption clause into four independent exemptions, Appellants contend that it is unreasonable in light of related statutory provisions. While consideration of related provisions and statutes is undeniably appropriate, *Campbell & Gwinn*, 146 Wn.2d at 11, we disagree that such consideration undermines the reasonableness of Respondents' interpretation.

¶21 Appellants first point to the first proviso of RCW 90.44.050, which states that "the department from time to time may require the person or agency making any such small withdrawal to furnish information as to the means for and the quantity of that withdrawal." Seizing upon the term "any such small withdrawal," which refers to the four exemptions, Appellants argue that this is evidence that the legislature intended to limit withdrawal to some defined quantity. This is not necessarily so. The legislature may have simply considered stock-watering withdrawals, in the aggregate, small as compared to other agricultural or domestic withdrawals. The term "small withdrawal[s]" is simply a shorthand reference to the four exemptions; it does not independently suggest that permit-exempt stock-water-

ing withdrawals are limited to a given quantity. As such, neither this phrase nor the term "minimal uses" in RCW 90.14.051 renders Respondents' proposed interpretation unreasonable.

¶22 Next, Appellants point out that the third proviso to RCW 90.44.050 allows parties "making withdrawals of groundwaters of the state not exceeding five thousand gallons per day" to apply for a permit. This language is clear and unambiguous, granting a certain class of permit-exempt groundwater users the opportunity to apply for a permit. This proviso in no way limits the amount of water that may be withdrawn by permit-exempt users. Appellants suggest that it is indicative of a legislative intent to divide water uses into two categories: (1) uses of 5,000 gallons of water per day or less, which are exempt from permits and (2) uses of more than 5,000 gallons of water per day, which are not exempt from permits. This approach fails for two reasons. First, not all uses of 5,000 gallons of water per day or less are exempt from permit requirements, only those for stock-watering, lawn or noncommercial garden, domestic, or industrial purposes are. RCW 90.44.050. Second, the language plainly does something very different. It identifies only certain uses that are exempt from the permit requirement, places additional limitations on some of those uses, and further allows only some of those certain limited permit-exempt uses to apply for an optional permit. The legislature enacted a sophisticated statute. The legislature's decision to limit those permit-exempt uses that may apply for an optional permit does not render Respondents' interpretation unreasonable.

¶23 Finally, Appellants assert that interpreting the exemption clause to allow withdrawal of "unlimited"[3] groundwater for stock-watering purposes is an "absurd result."

---

[3] Appellants' use of the term "unlimited" is ambiguous. It is accurate insofar as it indicates that use of groundwater for stock-watering purposes without a permit is not limited to a specific quantity by RCW 90.44.050. However, there are other limits to such use. *See, e.g.,* RCW 90.44.050 (limiting use to purpose of stock-watering and requiring that water be "regularly used beneficially"), .130 (permit-exempt use

Opening Br. of Appellants at 41. It is true that we "will avoid [a] literal reading of a statute which would result in unlikely, absurd, or strained consequences." *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002). However, this canon of construction must be applied sparingly. *See Duke v. Boyd*, 133 Wn.2d 80, 87, 942 P.2d 351 (1997) ("Although the court should not construe statutory language so as to result in absurd or strained consequences, neither should the court question the wisdom of a statute even though its results seem unduly harsh." (citation omitted)). Application of the absurd results canon, by its terms, refuses to give effect to the words the legislature has written; it necessarily results in a court disregarding an otherwise plain meaning and inserting or removing statutory language, a task that is decidedly the province of the legislature. *See Rest. Dev., Inc.*, 150 Wn.2d at 682 ("[A] court must not add words where the legislature has chosen not to include them."); *Point Roberts Fishing Co. v. George & Barker Co.*, 28 Wash. 200, 204, 68 P. 438 (1902). This raises separation of powers concerns. Thus, in *State v. Ervin*, 169 Wn.2d 815, 824, 239 P.3d 354 (2010), we held that if a result "is conceivable, the result is not absurd."

¶24 It is conceivable that the legislature intended to allow permit-exempt withdrawals of groundwater for stock-watering purposes without a specified quantity. It may be that, at the time of enactment of RCW 90.44.050, the legislature believed that stock-watering was sufficiently important, and its impact sufficiently slight, that a balancing of interests categorically justified groundwater withdrawals without consideration of other factors.[4] Because it is conceivable that the legislature intended this result, the

cannot impair senior water rights); RCW 90.54.050(2) (Department may close groundwater bodies to new appropriations); *cf. State ex rel. Roseburg v. Mohar*, 169 Wash. 368, 375, 13 P.2d 454 (1932) (allowing enforcement of water rights by direct action in court).

[4] To the extent this reasoning no longer holds true, it is for the legislature, not this court, to amend the statute.

result is not absurd and Respondents' proffered plain meaning is not thereby rendered unreasonable.

¶25 In sum, we conclude that Respondents' interpretation of the RCW 90.44.050 exemption clause is reasonable. This does not end our inquiry; if another interpretation is also reasonable, the statute is ambiguous and we may resort to legislative history and the circumstances surrounding the enactment of the statute.

¶26 Appellants' interpretation of the exemption clause in RCW 90.44.050 is not reasonable. As discussed above, Appellants contend that the exemption clause should be divided into two categories, the first being a bundle of three purposes and the second being a single purpose. To be reasonable, an interpretation must, at a minimum, account for all the words in a statute. Appellants fail to account for the first "or" in the exemption clause and, as a consequence, fail to give effect to the parallel structure created by the legislature. Simplified, the exemption clause allows withdrawals "for [Purpose A], or for [Purpose B], or for [Purpose C], or for [Purpose D]." RCW 90.44.050. If the legislature had intended to bundle Purposes A through C, we would expect it to read "for [Purpose A], [Purpose B], or [Purpose C], or for [Purpose D]" or "for [Purpose A], for [Purpose B], or for [Purpose C], or for [Purpose D]." *Id.* Either way, we would not expect a conjunction between the first and second items in a category listing three items. While perhaps conceivable, the "bundle" interpretation is not reasonable. There is simply no basis in the text of the statute to assume that the first three purposes were intended to be considered a single bundle of uses.

¶27 With collapse of the "bundle" interpretation, Appellants' argument that permit-exempt stock-watering withdrawals are limited to 5,000 gallons per day also fails. Accepting, as the sentence structure makes clear, that the exemption clause contains four distinct categories, it becomes apparent that each category is limited by its own qualifying language and only its own qualifying language.

Given that the "five thousand gallons a day" limitation appears twice in the exemption clause, it is evident that the legislature knew how to attach that limitation to multiple categories, and yet it chose only to apply it to two categories. *Id.* There is simply no textual basis for the conclusion that "five thousand gallons a day" modifies "for stock-watering purposes." *Id.* Accordingly, Appellants' proposed interpretation is not reasonable.

¶28 In sum, we conclude that there is only one reasonable interpretation of RCW 90.44.050's exemption clause, as Respondents contend. Accordingly, that interpretation is the plain meaning of the statute. Under this interpretation, the exemption clause breaks down into four categories as follows:

> [A]ny withdrawal of public groundwaters
>
> [(1)] for stock-watering purposes, or
>
> [(2)] for the watering of a lawn or of a noncommercial garden not exceeding one-half acre in area, or
>
> [(3)] for single or group domestic uses in an amount not exceeding five thousand gallons a day, or as provided in RCW 90.44.052, or
>
> [(4)] for an industrial purpose in an amount not exceeding five thousand gallons a day,
>
> is and shall be exempt from the provisions of this section.

*Id.* Each category is limited only by the qualifying phrase following it. The stock-watering exemption contains no qualifying phrase. Accordingly, under a plain reading of RCW 90.44.050, groundwater withdrawn without a permit for stock-watering purposes is not limited to 5,000 gallons per day. We affirm the superior court's grant of summary judgment to Respondents on this basis.

III. Easterday Is Not Entitled to Attorney Fees for the Change of Venue

¶29 The final issue in this case concerns whether Easterday is entitled to attorney fees for changing venue

from Thurston County to Franklin County. RCW 4.12-.090(1) provides, in relevant part, that "if the court finds that the plaintiff could have determined the county of proper venue with reasonable diligence, it shall order the plaintiff to pay the reasonable attorney's fee of the defendant for the changing of venue to the proper county." The Thurston County Superior Court issued an order granting Easterday's motion to change venue to Franklin County and ordered Appellants to pay the costs of the transfer. However, the court also specifically declined to find that Appellants could have determined, with reasonable diligence, that Franklin County was the county of proper venue and therefore denied Easterday's request for attorney fees.

¶30 It is well established that the "choice of venue 'lies with the plaintiff in the first instance.'" *Hatley v. Saberhagen Holdings, Inc.*, 118 Wn. App. 485, 488-89, 76 P.3d 255 (2003) (quoting *Baker v. Hilton*, 64 Wn.2d 964, 965, 395 P.2d 486 (1964)). When an action is filed against more than one defendant, venue is proper in any county where at least one defendant resides. RCW 4.12.025(1). RCW 4.92.010(5) provides that venue is proper in Thurston County when an action is filed against the State. As the declaratory judgment action initially named both Easterday and the State, venue was proper under RCW 4.12.025 in both Thurston County and Franklin County. Easterday does not appear to contend that venue was improper in Thurston County; instead it suggests that the relevant inquiry in determining whether to award attorney fees under RCW 4.12.090 is (1) whether venue was proper in the county to which venue was changed and (2) whether the plaintiff could have determined that venue was proper with reasonable diligence. Resp't/Cross Appellant Easterday's Reply on Cross-Appeal at 4. This ignores that venue may be proper in more than one county. So long as venue was not improper in the county in which the plaintiff filed the action, attorney fees are not available under RCW 4.12.090.

¶31 Though Easterday does not advance the argument before this court, the trial court also appears to have relied on RCW 4.12.010 to support its decision to change venue.[5] There is no Washington case law addressing whether a declaratory judgment action relating to a statute governing water rights is a local action. As such, even if this is a local action, that is not a determination that Appellants could have ascertained with reasonable diligence. Accordingly, the superior court correctly determined that Easterday was not entitled to attorney fees under RCW 4.12.090.

## CONCLUSION

¶32 We hold that Appellants possessed standing to bring this declaratory judgment action. We further hold that the superior court correctly granted summary judgment to Respondents on the basis that RCW 90.44.050 allows construction of wells and withdrawal of groundwater for stockwatering purposes without a permit and that such withdrawals are not limited to 5,000 gallons per day. Finally, we agree with the superior court that Easterday was not entitled to attorney fees for the change of venue. We affirm the superior court in all respects.

C. JOHNSON, ALEXANDER, CHAMBERS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶33 WIGGINS, J. (dissenting) — I agree with the majority that appellants Five Corners Family Farmers et al. have

---

[5] If RCW 4.12.010 applied, that would raise the troublesome issue of whether that statute is one of jurisdiction, *Snyder v. Ingram*, 48 Wn.2d 637, 638, 296 P.2d 305 (1956), or one of venue, *cf. Young v. Clark*, 149 Wn.2d 130, 134, 65 P.3d 1192 (2003) (overruling case law and holding that article IV, section 6 of the Washington Constitution generally prevents the legislature from limiting subject matter jurisdiction "as among superior courts"). Unless we were to overrule *Snyder*, if RCW 4.12.010 required that this case be filed in Franklin County, the proper remedy would have been dismissal, not transfer. The parties have not briefed this issue, and we decline to address it.

standing and that Easterday Ranches Inc. is not entitled to attorney fees. I dissent because I believe the stock-watering permit exemption in RCW 90.44.050 is ambiguous and the legislature intended to limit the exemption to 5,000 gallons of water per day.

¶34 The purpose of requiring a permit for groundwater use is to protect senior water rights and the public welfare. Before a permit is issued, the Department of Ecology must find that (1) water is available, (2) the proposed use is beneficial, and (3) appropriation will not impair existing rights or (4) be detrimental to the public welfare. RCW 90.03.290(3). If a groundwater use is exempt from permitting requirements, the Department of Ecology does not make these findings before use begins. Thus, any permit-exempt use potentially threatens existing water rights and the public welfare; the larger the exemption, the greater the threat.

¶35 I conclude that the legislature never intended that RCW 90.44.050 would allow Easterday to use between 450,000 and 600,000 gallons of water per day with no inquiry whatsoever into whether existing rights may be impaired or the public welfare may be harmed. Rather, I believe the legislature enacted an ambiguous statute that is now being read to produce a result contrary to legislative intent.

I. The stock-watering exemption is ambiguous

¶36 We apply ordinary principles of statutory interpretation to determine whether a statute is ambiguous. For a statute to be ambiguous, it must have more than one reasonable interpretation. *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001). A statute's meaning is derived "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). We must not read any provision in isolation but look at the statute as a whole. *Id.*

¶37 There are two reasonable interpretations of the stock-watering exemption: first, an "unlimited" interpretation and second, a "limited" interpretation.

¶38 Under the "unlimited" interpretation, the statute creates four categories of exemption, each of which is subject only to its own limitations:[6]

[A]ny withdrawal of public ground waters

[(1)] for stock-watering purposes, or

[(2)] for the watering of a lawn or of a non-commercial garden not exceeding one-half acre in area, or

[(3)] for single or group domestic uses in an amount not exceeding five thousand (5,000) gallons a day, or

[(4)] for an industrial purpose in an amount not exceeding five-thousand (5,000) gallons a day,

is and shall be exempt from the provisions of this section. . . .

LAWS OF 1945, ch. 263, § 5. Under this approach, three of the four delineated categories are expressly limited. The third (single or group domestic use) and the fourth (industrial use) are expressly limited to withdrawals of less than 5,000 gallons per day. The second category (watering a lawn or a noncommercial garden) is limited to one-half acre. By contrast, the first category (stock-watering purposes) contains no language limiting the amount of withdrawal.

¶39 Under the second "limited" interpretation, the exemption is divided into two categories, domestic and industrial, and the 5,000 gallon per day limit applies to both:

[A]ny withdrawal of public ground waters

[(1)] for stock-watering purposes, or for the watering of a lawn or of a non-commercial garden not exceeding one-half acre in area, or for single or group domestic uses *in an amount not exceeding five thousand (5,000) gallons a day*, or

---

[6] I use the statute as originally passed in 1945 for this analysis. *See* LAWS OF 1945, ch. 263, § 5 (codified as amended at RCW 90.44.050).

[(2)] for an industrial purpose *in an amount not exceeding five thousand (5,000) gallons a day*,

is and shall be exempt from the provisions of this section. . . .

*Id.* (emphasis added).

¶40 Under this view, the first 5,000 gallon limitation applies to the first three exemptions. The second 5,000 gallon limitation applies to industrial use. In other words, every permit-exempt use is limited to 5,000 gallons per day.

¶41 I disagree with the majority's conclusion that this limited interpretation is not reasonable. I find both the limited and unlimited interpretations reasonable, and for that reason I believe the statute is ambiguous.

¶42 The statute is ambiguous when it is read as a whole. The ambiguity arises from two provisos found at the end of the statute. The first proviso allows the Department of Ecology to request information from the water user about permit-exempt use. In doing so, it refers to all permit exemptions as "small withdrawal[s]":

PROVIDED, HOWEVER, That the department from time to time may require the person or agency making any such small withdrawal to furnish information as to the means for and the quantity of that withdrawal. . . .

RCW 90.44.050. This reference to "small withdrawal" suggests the legislature intended to exempt only small water uses. This creates dissonance with the unlimited interpretation, which would allow very large permit-exempt withdrawals. This in turn suggests that the limited interpretation is more reasonable. In particular, it seems highly unlikely that the legislature would have used the term "small withdrawal" if it had intended to create a permit exemption that was entirely without limit and could be used to withdraw more than 400,000 gallons of water per day without a permit.[7]

---

[7] The majority suggests that "[t]he legislature may have simply considered stock-watering withdrawals, in the aggregate, small as compared to other agri-

¶43 The second proviso is even more troubling for the unlimited interpretation. It gives the permit-exempt user the option to obtain a permit if desired, and in doing so it appears to assume that all exempt uses are limited to 5,000 gallons per day:

> PROVIDED, FURTHER, That at the option of the party making withdrawals of groundwaters of the state not exceeding five thousand gallons per day, applications under this section or declarations under RCW 90.44.090 may be filed and permits and certificates obtained in the same manner and under the same requirements as is in this chapter provided in the case of withdrawals in excess of five thousand gallons a day.

*Id.* The language of this second proviso suggests that there are two classes of water use: uses under 5,000 gallons per day that fall under an exemption and uses over 5,000 gallons per day, which always require a permit. This language appears to assume that *every* permit-exempt withdrawal is limited to 5,000 gallons per day. Indeed, I have a hard time seeing how the second proviso can be read any other way. This second proviso plainly conflicts with the unlimited interpretation, again making the limited interpretation more reasonable in comparison.

¶44 I am not convinced by the majority's attempt to explain away this inconsistency. *See* majority at 310. The majority claims the legislature meant to give exempt users the option of obtaining a permit if they use less than 5,000 gallons per day but not if they use more than 5,000 gallons per day. Frankly, this explanation strains credulity. I can think of no possible reason to allow the option of a permit

cultural or domestic withdrawals." Majority at 309. But this does not make sense in light of the fact that all of the other exemptions in the statute are limited in some unambiguous way. Two of them (single- or group-domestic use and industrial use) are unquestionably limited to 5,000 gallons per day, and the third, lawn-watering, is limited to one-half acre. It is elementary to statutory construction that we must construe elements in a list in light of the company they keep. *State v. Roggenkamp*, 153 Wn.2d 614, 623, 106 P.3d 196 (2005). I find it difficult to believe that the legislature would include, in the same list of "small withdrawal[s]," three exemptions in the 5,000-gallon-or-below range and one that would allow withdrawal of between 450,000 and 600,000 gallons of water per day.

for exempt users of less than 5,000 gallons per day but not for exempt users of more than 5,000 gallons per day. The more likely explanation is that the legislature assumed that under the statute every exemption was capped at 5,000 gallons per day and sought to give all exempt users the option of obtaining a permit.[8] This directly conflicts with the unlimited interpretation.

¶45 These two provisos lead me to believe that both the limited and the unlimited interpretations are reasonable, and therefore the statute is ambiguous. The unlimited interpretation is in patent disharmony with the second proviso, and arguably with the first proviso as well. In contrast, the limited interpretation makes sense in light of both. We should not pretend a statute has a plain meaning when it does not. Instead, we should recognize that RCW 90.44.050 is ambiguous and attempt to decipher its legislative intent.

## II. The legislature intended to limit the stock-watering exemption to 5,000 gallons per day

¶46 Our fundamental objective in constructing a statute is to ascertain and carry out the intent of the legislature. *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991). Here, many factors lead me to conclude that the legislature's intent was to cap *all* permit exemptions at 5,000 gallons per day, including the stock-watering exemption.

¶47 First, an unlimited interpretation conflicts with the purpose of the 1945 groundwater code. The purpose of the 1945 code was to subject the withdrawal of groundwater to the permitting process in order to protect senior water

---

[8] The second proviso was added to the statute in 1947, but that does not mean we cannot rely on it to ascertain legislative intent. "[W]here a former statute is amended, such amendment is strong evidence of legislative intent of the first statute." *Waggoner v. Ace Hardware Corp.*, 134 Wn.2d 748, 755-56, 953 P.2d 88 (1998) (citing 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 49.11, at 83 (5th ed. 1992); *Cowiche Growers, Inc. v. Bates*, 10 Wn.2d 585, 604, 117 P.2d 624 (1941); *Groves v. Meyers*, 35 Wn.2d 403, 408, 213 P.2d 483 (1950)).

rights and the public welfare. *See* RCW 90.44.020; RCW 90.03.290(3). Indeed, under the majority's unlimited interpretation, stock-watering would be the only exception not subject to any limitation at all. This would put senior water rights and the public welfare at risk and contravene the purpose of the groundwater code. The limited interpretation makes more sense in light of the purpose underlying the code. The limited interpretation is true to the principle that we interpret statutes to implement the general rule and narrowly interpret exceptions to the rule. *W. Valley Land Co. v. Nob Hill Water Ass'n*, 107 Wn.2d 359, 369, 729 P.2d 42 (1986). The general rule of RCW 90.44.050 is that a permit is required for any new withdrawal of groundwater, while stock-watering and the other specified uses are all exceptions that should be read narrowly. A limited interpretation complies with this general principle, whereas an unlimited interpretation contravenes the purpose of the 1945 code.

¶48 Second, the limited interpretation is consistent with the historical context in which the exemption was enacted.[9] The stock-watering exemption was enacted in an era when the legislature was concerned with providing permit-free water to small family farms:

> At the time the Legislature enacted the statute, Washington and the United States Bureau of Reclamation were attempting to populate the Columbia Basin region with family farms [as] part of its plan to "develop the West through the creation of permanent family farms on Federal Reclamation projects." . . .
>
> For settlement to succeed, every rural settler needed a domestic supply of water at a minimum cost.

Kara Dunn, *Got Water? Limiting Washington's Stock-watering Exemption To Five Thousand Gallons Per Day*, 83

---

[9] *See Wash. State Nurses Ass'n v. Bd. of Med. Exam'rs*, 93 Wn.2d 117, 121, 605 P.2d 1269 (1980) ("[Legislative purpose] can be found by examining the historical context in which a statute was passed to identify the problem that the statute was intended to solve." (citing *Pearce v. G.R. Kirk Co.*, 92 Wn.2d 869, 872, 602 P.2d 357 (1979))).

WASH. L. REV. 249, 258 (2008) (footnote omitted) (quoting Donald J. Pisani, *Federal Reclamation and the American West in the Twentieth Century*, 77 AGRIC. HIST. 391, 401 (2003)). The groundwater code's statutory exemptions may have originated in a report produced by the Bureau of Reclamation on providing water to small family farms:

> A 1945 Bureau of Reclamation report on farm improvement recommended that the supply of domestic water "should be sufficient (1) to satisfy the personal demands of the settlers, including the operation of plumbing facilities; (2) to water livestock; (3) to sprinkle lawns and small gardens occasionally; (4) to process farm products; and (5) to provide some fire protection." These recommended categories parallel the categories codified in Washington's groundwater exemption statute in the same year that the Bureau of Reclamation published its report.

*Id.* at 258-59 (footnote omitted). It was estimated that these farms would use an average of 200 to 1,500 gallons of water per day. *Id.* It is highly unlikely that the legislature contemplated in 1945 that the stock-watering exemption would apply to an industrial feedlot using between 450,000 and 600,000 gallons of water per day, and we should be wary of any interpretation that allows such a use. In contrast, the limited interpretation is consistent with the concerns of the era in which it was enacted.

¶49 Third, the limited interpretation is more consistent with our canons of statutory construction. It is well established that "words grouped in a list should be given related meaning." *Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 322-23, 97 S. Ct. 2307, 53 L. Ed. 2d 368 (1977). In Washington, this is enshrined in the principle of noscitur a sociis, which roughly translates to "words are known by the company they keep." *See State v. Roggenkamp*, 153 Wn.2d 614, 623, 106 P.3d 196 (2005). Here, three of the exemptions in RCW 90.44.050 are indisputably limited in some way: the single- or group-domestic and industrial exemptions are limited to 5,000 gallons a day, and the

lawn-watering exemption is limited to one-half acre of lawn. In the context of these "small withdrawal[s]," it would be strange indeed if the fourth exemption in this list allowed water users like Easterday to withdraw limitless amounts of water without a permit or indeed without any consideration whatsoever of whether such withdrawals would harm the public welfare or impair existing water rights.

¶50 Fourth, as discussed above, the two provisos in the statute suggest a legislative intent to limit the exemption to 5,000 gallons per day. The reference to "any such small withdrawal" in the first proviso is particularly suggestive of legislative intent in light of the fact that two of the exemptions to which it refers are unquestionably limited to 5,000 gallons per day, and the other to one-half acre of lawn. In this context, it is illogical to consider 450,000 to 600,000 gallons per day to be a "small withdrawal." As for the second proviso, as discussed above, only the limited interpretation is consistent with this proviso, suggesting the legislature intended this interpretation and not an unlimited one. In short, both provisos support the limited interpretation and undermine an unlimited interpretation.

¶51 Finally, we should be guided by Department of Ecology's long standing interpretation of the exemption. We accord great weight to the contemporaneous construction placed on a statute by officials charged with its enforcement, especially where the legislature has silently acquiesced in that construction over a long period of time. *In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 780, 903 P.2d 443 (1995) (citing *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990)). Until 2005, the agency responsible for enforcement of the groundwater code (initially the Department of Conservation and then the Department of Ecology) followed the limited interpretation. The most recent example of this is the 2001 *DeVries* litigation. *DeVries v. State*, PCHB 01-073, 2001 WA ENV LEXIS 46 (Wash. Pollution Control Hr'gs Bd. Sept. 27, 2001) (limiting the

stock-watering exemption to 5,000 gallons per day). The Department of Ecology and the Department of Conservation held this position for many years, and the legislature silently acquiesced in that interpretation. The Department of Ecology changed its position only after the attorney general issued 2005 Op. Att'y Gen. No. 17, which, as discussed by the majority, is not entitled to great interpretive weight.[10] *See* majority at 308-13. We should be guided by the Department of Ecology's limited interpretation and the legislature's longstanding acquiescence therein.

¶52 The legislature may have drafted an ambiguous stock-watering exemption, but its purpose is sufficiently clear. We should hold that the exemption is limited to 5,000 gallons per day.

¶53 I dissent.

MADSEN, C.J., and STEPHENS, J., concur with WIGGINS, J.

---

[10] The legislature has not acquiesced in the unlimited interpretation of 2005 Op. Att'y Gen. No. 17. Instead, the legislature has convened a task force to study how to deal with the stock-watering exception. ENGROSSED SUBSTITUTE H.B. 1244, § 302(17)(a)-(c), at 107, 61st Leg., Reg. Sess. (Wash. 2009). At the end of 2009, the task force reported to the legislature that it had studied the issue but had not decided on any recommendation. DEP'T OF ECOLOGY, STOCK WATER WORKING GROUP REPORT, *available at* http://www.ecy.wa.gov/programs/wr/hq/pdf/swtr/011010_stockwater_workingroup_finalreport.pdf (Jan. 11, 2010). Some members questioned the wisdom of proceeding with any recommendations while this case is pending before us. *Id.* at 6 ("I think it makes much more sense for this work group to meet after the courts have weighed in on this issue.").